IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN THE DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL D. BRANDT, minor, by<br>his parent, STEPHEN M. BRANDT;<br>REBECCA L. DARUGAR, minor, by<br>her parent, LORI DARUGAR;<br>ALDO S. K. VAN ENCK, minor, by<br>his parent, SARA KATAYANAGI VAN<br>ENCK; on behalf of themselves and all others<br>similarly situated,<br><br>    Plaintiffs,<br><br>   v.<br><br>BOARD OF EDUCATION OF THE CITY<br>OF CHICAGO; CHRIS N. KOTIS, individually<br>and officially; JANICE M. ROSALES,<br>individually and officially; CHRISTINE<br>LAUGHLIN, individually and officially; MARY<br>CHANCY, individually and officially,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 04 C 0904<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

   The parents of minor Plaintiffs Michael Brandt, Rebecca Darugar, and Aldo Van Enck

filed the present Amended Class Action Complaint on behalf of their children and all others

similarly situated against Defendants Board of Education of the City of Chicago, Chris Kotis,

Janice Rosales, Christine Laughlin, and Mary Clancy.  In their Amended Complaint, Plaintiffs

allege that Defendants violated their First Amendment right to free speech.  *See* 42 U.S.C.

§ 1983.  Before the Court are the parties' Cross-Motions for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56(c).  For the following reasons, the Court denies Plaintiffs'

Partial Motion for Summary Judgment and grants Defendants' Motions for Summary Judgment.

# BACKGROUND

## I.      Northern District of Illinois Local Rules

When determining summary judgment motions, the Court derives the background facts from the parties' Northern District of Illinois Local Rule 56.1 statements.  The Local Rules provide parties with specific details as to how litigants in the Northern District of Illinois should approach summary judgment motions and responses.  Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue."  Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial.  The parties' statements must contain short numbered paragraphs including references to the affidavits, parts of the record, and other supporting materials.  *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004); *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).

It is not appropriate to set forth additional facts in a Rule 56.1(b)(3) response statement, instead, the parties must include any additional facts in a separate Rule 56.1 statement.  *See Ammons,* 368 F.3d at 817.  Responses that are not contested are deemed admitted.  *Brengettcy v. Horton,* 423 F.3d 674, 681 (7th Cir. 2005); *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). Statements and responses that do not properly cite to the record are subject to the Court's discretion as to their admissibility.  *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).  The Court also reminds the parties that when citing to the record in their legal memoranda, they are required to cite to the numbered paragraphs of the Local Rule 56.1 Statements and not to the underlying record.  *See Malec,* 191 F.R.D. at 586.  With these

principles in mind, the Court turns to the relevant facts of this case.[1]

## II.    Relevant Facts

### A.    Parties

Plaintiffs are a certified class of 24 of the 27 students who were in the eighth grade class in the Regional Gifted Center Program at Jean Baptiste Beaubien Elementary School ("Beaubien School") in Chicago, Illinois, during the 2002-03 school year.  (R. 134-1, Pls.' Rule 56.1 Stmt. ¶ 1; R. 140-1, Defs.' Joint Rule 56.1 Stmt. ¶ 2.)

Defendant Board of Education of the City of Chicago ("Board") is a body politic and corporate in charge of overseeing the management and operations of a system of free schools known as the Chicago Public Schools.  (Pls.' Stmt. ¶ 2.)  Defendant Chris Kotis is the Principal of Beaubien Elementary School and was the Principal during the relevant time period.  (*Id.* ¶ 3; Defs.' Stmt. ¶ 3.)  The Board of Education has adopted a rule that specifically authorizes principals to exercise control over the school in all areas authorized by Illinois statute.  (Defs.' Stmt. ¶ 9.)  The Uniform Discipline Code ("UDC"), a series of rules and regulations that categorize different types of rule infractions and prescribe a range of consequences for each type of infraction, further defines Principal Kotis' role.  (Defs.' Stmt. ¶ 10.)  For example, the UDC requires students to dress in a manner that neither disrupts the educational process nor poses a safety hazard.  (*Id.* ¶¶ 13, 22; R. 160-1, Pls.' Stmt. Add'l Facts ¶ 30.)

---

[1] In their Reply Brief, Plaintiffs argue that Defendants' use of their Joint Rule 56.1(a)(3) Statement of Facts in response to Plaintiffs' Partial Motion for Summary Judgment is prohibited by the local rules.  Plaintiffs have not cited any legal authority supporting this argument and the Court has found none.  Meanwhile, Plaintiffs' allegation that they cannot adequately respond to Defendants' Joint Rule 56.1 Statement in this context is disingenuous because Plaintiffs have already responded to Defendants' statement in detail.  (*See* R. 166-1, Pls.' Resp. to Defs.' Stmt.)

Defendant Mary Clancy was the Gifted Program Coordinator at Beaubien School during the 2002-03 school year.  (Pls.' Stmt. ¶ 6; Defs.' Stmt. ¶ 4.)  Defendant Christine Laughlin was the Assistant Principal at Beaubien School during the 2002-03 school year.  (Pls.' Stmt. ¶ 5; Defs.' Stmt. ¶ 5.)  Defendant Janice Rosales was the Chicago Public Schools Area Instructional Officer ("AIO") for Region One, Area One, which encompassed Beaubien School during the 2002-03 school year.  (Pls.' Stmt. ¶ 4; Defs.' Stmt. ¶ 6.)

**B.      The T-Shirt**

Beaubien School held an annual contest among the eighth grade students to determine the design for the class T-shirt.  (R. 35-1, Am. Compl. ¶ 32.)  In the second semester of school year 2002-03, students submitted twenty designs for the Class of 2003 T-shirt election.  (*Id.* ¶ 33; Defs.' Stmt. ¶¶ 55, 57, 59.)  The eighth grade students did not choose Plaintiff Michael Brandt's T-shirt design for the official class T-shirt.  (*Id.*)  Michael Brandt's T-shirt design contained the image of a boy giving a thumbs-up signal with one hand with the other arm ending in a handless nub from which a leash extended to a dog labeled the school mascot "Beaubien Bulldog."  (R. 137-1, Kotis' Mot. Summ. J., Ex. 2; Am. Compl. ¶ 34.)  The boy is wearing a shirt that says, "Beaubien Class of 2003," and pants bearing a grid design.  (*Id.*)  After losing the T-shirt election, Plaintiffs added the word "gifties" to the back of the shirt.  (Pls.' Stmt. Add'l Facts ¶ 5.)

**C.      The Petition**

Principal Kotis prohibited the gifted students' T-shirt design as an alternative graduation shirt because a fair vote was conducted and the alternative T-shirt did not win the election.  (Defs.' Stmt., Ex. A, C. Kotis Dep., at 56.)  Thereafter, the gifted students drafted a petition for the other students to sign concerning their T-shirt.  (Am. Compl. ¶ 38c; Defs.' Stmt, Ex. Z, R.

4

Darugar Dep., at 67-70.)  The petition indicated that the regular students had no objection to anyone wearing the alternative T-shirt.  (Am. Compl. ¶ 38c.)  At her deposition, Rebecca Darugar testified that "the purpose of the petition was so that we could have and wear these T-shirts."  (Defs.' Stmt., Ex. Z, R. Darugar Dep., at 67.)  Rebecca Darugar also testified that they were going to give the petition to the Local School Council to show that they had support for their alternative T-shirt design.  (*Id.* at 68.)

### D.  Local School Council Meeting

Also after Principal Kotis prohibited the alternative T-shirt design, he met with the gifted class and expressed his concerns about the anger over Michael Brandt's losing design.  (Defs.' Stmt. ¶ 70 & Ex. A, Kotis Dep. at 68.)  Kotis then invited the students to address the issue at the Local School Council meeting scheduled for the following week on February 19, 2003.  (Defs.' Stmt. ¶ 70.)  Thereafter, Michael Brandt addressed the Local School Council.  (R. 166-1, Pls.' Resp. to Defs.' Stmt. ¶ 71.)  At his deposition, Michael Brandt testified that when he addressed the Local School Council, he stated that his T-shirt design better represented the gifted students because the T-shirt "was made available to the gifted students, people who I had spent combined total of thousands of hours in close contact with.  We felt that us having our own shirt better represented us than having a shirt shared with people with who [sic] we hardly knew."  (Defs.' Stmt., Ex. M., M. Brandt's Dep. at 116-17.)  Michael Brandt also told the Local School Council that the gifted class thought they had won the T-shirt election and felt frustrated that the school did not explain to them how the voting was conducted.  (Pls.' Resp. to Defs.' Stmt. ¶ 71.)  In the end, the Local School Council supported Principal Kotis' decision to prohibit the alternative T-shirts.  (Defs.' Stmt. ¶ 75.)

### E. Wearing the T-Shirts to School

Despite the T-shirt's prohibition, the gifted students produced the "gifties" T-shirt and 19 of the gifted students wore the T-shirts to school on April 1, 2003. (Defs.' Stmt. ¶ 76; Pls.' Stmt. ¶ 14.) Gifted student Nicholas Haak testified that it was "kind of ironic that we were doing it on April Fools' Day as an April Fools' joke." (Defs.' Stmt., Ex. DD, N. Haak Dep., at 70-71.) Principal Kotis did not know that the students were wearing the T-shirts on April 1, 2003 until the Gifted Program Coordinator Mary Clancy informed him. (Defs.' Stmt. ¶ 80.) Principal Kotis told the gifted students that they were in violation of the Uniform Disciplinary Code for failing to abide by the schools rules or regulations. (Pls.' Stmt. ¶ 16.) The rule at issue was Beaubien School Dress Code No.2, which states in relevant part: "Clothing with inappropriate words or slogans is not permitted." (*Id.* ¶ 9.) Thereafter, Kotis told Clancy to contact the students' parents to tell them that the students had violated a school disciplinary code for wearing the "gifties" T-shirts to school. (Defs.' Stmt. ¶ 71; Pls.' Stmt. ¶ 18.)

### F. Tensions Between Gifted and Regular Students

Sometime between April 1 and April 4, 2003, Principal Kotis told Area Instructional Officer Rosales that hostilities existed between the gifted and regular students at Beaubien School. (Defs.' Stmt. ¶ 93; Pls.' Stmt. Add'l Facts ¶ 14.) After that, Rosales instructed Kotis to let her know if there were any further problems. (Defs.' Stmt. ¶ 94.) Rosales testified that Kotis "would be monitoring the behavior of the children and encouraging the children to – working with the teachers in order to improve the conditions of safety and security of the children, because safety was what I was concerned about." (Defs.' Stmt. ¶ 114, Ex B., Rosales Dep. at 46.)

At their depositions, Kotis, Clancy, and Laughlin also testified that tensions existed between the gifted and regular students.  (Defs.' Stmt., Ex. R., Kotis Dep. at 9-11; Ex. N, Clancy Dep. at 41, 47, Ex. O, Laughlin Dep. at 12-14.)  Kotis testified that there had been at least one physical altercation between a gifted and regular student at Beaubien School.  (Defs.' Stmt., Ex. R., Kotis Dep. at 9-11; Ex. A, Kotis Dep. at 83.)  In addition, Laughlin testified that there had been incidents after school between gifted and regular students.  (Defs.' Stmt., Ex. O, Laughlin Dep. at 12-14.)  Moreover, Clancy testified that she thought that the gifted students' design on the T-shirt insulted students with physical deformities.   (Pls.' Stmt. Add'l Facts ¶ 5.)

A number of gifted students wore the T-shirts again on May 12, 2003.  (Defs.' Stmt. ¶ 99.)  Shortly thereafter, a gifted student wrote Rosales a letter about the tension between the gifted and regular students at Beaubien School.  (Defs.' Stmt. ¶ 104, Ex. C, Rosales Decl. ¶¶ 8, 10.)

### G.      Possible Solutions to T-Shirt Problem

Meanwhile, on May 15, 2003, Kotis and Rosales held a meeting to work with the parents to create possible solutions to the T-shirt controversy.  (Defs.' Stmt. ¶ 125.)  Rosales testified that at the end of the May 15 meeting, they presented choices to the parents and students, including "[t]hat they could have their – I believe that they could have their T-shirt, keep it as it was and stay in their classroom and receive all of their classes, 100 percent of their program in their classroom...."  (*Id.* ¶ 126; Ex. B, Rosales Dep. at 77.)  Rosales further testified that the students could also cover the word "gifties" on the T-shirt and then they would have access to anywhere in the school.  (*Id.*; Ex. B, Rosales Dep. at 77.)  The next day, Rosales presented the options to the gifted class.  (*Id.* ¶ 126(a)).  After that, at least one gifted student wore the banned

T-shirt to school every day until May 23, 2003.  (Defs.' Stmt., Ex. Z, Darugar Dep. at 42.)


### H.    Crisis Intervention Team

Consequently, Rosales contacted the Crisis Intervention Office at the Board of Education's central office concerning the T-shirt controversy at Beaubien School.  (Defs.' Stmt. ¶ 127.)  The Crisis Intervention Team included a facilitator and Beaubien School's counselor, social worker, and psychologists who worked with both the regular and gifted students.  (*Id.* ¶ 128.)  From May 19 until 23, 2003, the Crisis Team spoke directly to each of the three eighth grade classes, including the gifted class.  (*Id.* ¶ 129; R. 167-1, Pls.' Appendix, Ex. D, Crisis Team Report.)  The Crisis Intervention Team's report stated in pertinent part:  "In the General Education classroom (300, 310) the students were not concerned that the students in the gifted program were wearing a shirt different from the class shirt.  They were concerned that a consequence of the T-shirt issue would be loss of their Eighth Grade Yearbook, loss of their class trip to Springfield, and potential disruption to graduation."  (R. 167-1, Pls.' Appendix, Ex. D, Crisis Team Report, at 1.)  The report also stated that the crisis team met with Principal Kotis to convey the sentiments of the students, and consequently stated that "Mr. Kotis was relieved to find that wearing the T-shirt with "Giftee" on the back did not appear to jeopardize student safety.  He decided that as long as student safety was not being compromised, the students could wear the T-shirt which was in question."  (*Id.*)  Accordingly, after the Crisis Intervention Team's evaluation, Principal Kotis allowed the students to wear the "gifties" T-shirts to school.  (Defs.' Stmt. ¶ 133.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On cross-motions for summary judgment, the Court construes all the facts and reasonable inferences in favor of the party against whom the motion under consideration is made. *Schneider v Sentry Group Long Term Disability Plan,* 422 F.3d 621, 626 (7th Cir. 2005). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## ANALYSIS

Plaintiffs assert that Defendants' prohibition of the "gifties" T-shirt denied the gifted students their First Amendment right to free speech. Plaintiffs further argue that the relevant school disciplinary and dress codes constituted an unconstitutional prior restraint of the gifted students' free speech. Also, Plaintiffs challenge these codes as unconstitutionally overbroad and vague. Finally, Plaintiffs allege that Defendants retaliated against the gifted students for wearing the "gifties" T-shirts after the school administration had specifically prohibited the T-shirts.[2]

---

[2] Plaintiffs have failed to respond to Defendants' arguments that their First Amendment retaliation claim is without merit. Accordingly, Plaintiffs have waived their retaliation claim. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *see also United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) *(*"We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)"); *Volvosek v. Wisconsin Dep't of Agr. Trade & Consumer*

The First Amendment protects the freedom of speech and expressive conduct, and generally prevents the government from proscribing such activities. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992). First Amendment protections of speech and expressive conduct, however, are not absolute. *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 506, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Since the *Tinker* decision, the Supreme Court has held that schools cannot punish students for expressing their personal views at school "unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (quoting *Tinker*, 393 U.S. at 506). Furthermore, a school need not tolerate student speech that is inconsistent with the school's basic educational mission even though the First Amendment would protect similar speech or expressive conduct outside of the school setting. *Kuhlmeier,* 484 U.S. at 266 (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 685, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986)) (public school students' First Amendment rights not automatically coextensive with rights of adults in other settings).

## I.  Protected Speech

---

*Protection,* 344 F.3d 680, 689 n. 6 (7th Cir. 2003) (complete absence of legal argument waives consideration of claim).

Defendants contend that the gifted students' wearing of the T-shirts to school was not an attempt to express any particularized message, such as a political affiliation or a protest of social issues, and that the message did not have the likelihood of being understood by those who viewed it. The First Amendment protects conduct, symbols, and non-verbal speech which express ideas or convey a message that would likely be understood by the viewer. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296, 104 S. Ct. 3065, 3069 (1984); *Spence v. State of Washington*, 418 U.S. 405, 409-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). For example, in *Tinker*, the Supreme Court recognized that the expressive nature of students wearing black armbands in protest of the Vietnam War was protected speech. *See Tinker,* 393 U.S. at 505-06. Other examples of protected expressive conduct include the burning of the American flag during a political demonstration at the 1984 Republican National Convention, *see Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and the taping of a peace sign on an American flag in protest of the invasion of Cambodia and the Kent State tragedy. *See Spence,* 418 U.S. at 410.

Here, Plaintiffs contend that regardless of the content of the design, the T-shirt was made and worn as a symbol of protest. Specifically, Plaintiffs argue that the T-shirt conveyed the message that "we were cheated in the election and this is the shirt that should have won." (R. 164-1, Pls.' Mem. In Opp. to Kotis' Mot. For Summ. J., at 2.)[3] Plaintiffs bear the burden of

---

[3] Plaintiffs' alternative argument that the T-shirts were "art" and that "it goes without saying that art is expression protected by the First Amendment" is waived because Plaintiffs fail to develop their argument with supporting evidence and pertinent legal authority. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *see also United States v. Turcotte,* 405 F.3d 515, 536 (7th Cir. 2005) ("unsupported and undeveloped arguments are waived.") (citations omitted).

demonstrating that the First Amendment protects their expressive conduct. *See Community for Creative Non-Violence,* 468 U.S. at 293 n.5; *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 764 (7th Cir. 2004). Specifically, "[a]lthough it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Community for Creative Non-Violence,* 468 U.S. at 293 n.5.

### A.    Particularized Message

The Court thus evaluates whether the "gifties" T-shirt and the wearing of the T-shirt had a "particularized message." *See Community for Creative Non-Violence*, 468 U.S. at 296. Many of the gifted students' statements about the T-shirt and their wearing of the shirt to school do not indicate that they were protesting the T-shirt election. For example, Michael Brandt, the designer of the T-shirt, stated that the T-shirt was "supposed to look silly, meaning, it was suppose to look funny. It's suppose to be ironic that we were graduating eighth grade, making [sic] step into higher education and, at the same time, it's got a very goofy looking kid – to have a very goofy looking kid on the front of a shirt that stands for the milestone of going into higher education was just ironic." (Defs.' Stmt., Ex. M., M. Brandt's Dep. at 109-10.) Other gifted students – Rebecca Darugar and Aldo Van Enck – testified that the T-shirt was made to represent the gifted class. (Defs.' Stmt., Ex. Z, R. Darugar Dep., at 114-15; Defs.' Stmt, Ex. UU, A. Van Enck Dep. at 17.) Further, gifted student Nicholas Haak testified that when they wore the T-shirts for the first time it was "kind of ironic that we were doing it on April Fools' Day as an April Fools' joke." (Defs.' Stmt., Ex. DD, N. Haak Dep., at 70-71.)

On the other hand, Rebecca Darugar also testified that the gifted students wore the T-shirts in protest of Kotis' decision that forbade them from wearing the T-shirts to school. (Defs.' Stmt., Ex. Z, R. Darugar Dep., at 58.) Another gifted student, Daniel Schmidt, testified that they made and wore the T-shirts to taunt the administration, although he did not explain why the gifted students were taunting the administration in the first instance. (Defs.' Stmt. ¶ 64, Ex. CC, D. Schmidt Dep. at 49.) Furthermore, Michael Brandt told the Local School Council that the gifted class thought they had won the T-shirt election and felt frustrated that the school did not explain to them how the voting was conducted. (Pls.' Resp. to Defs.' Stmt. ¶ 71.)

Although Defendants argue that the students simply wore the T-shirts in defiance of the administration's prohibition of the shirts, the Court must view the facts and all reasonable inferences in a light most favorable to Plaintiffs. Accordingly, based on the facts discussed above, especially Michael Brandt's complaint to the Local School Board, Plaintiffs have established that a genuine issue of material fact exists as to whether the students wore the T-shirts in protest of the T-shirt election.

### B.      Likelihood of Being Understood

The Court next turns to the second half of the relevant inquiry, namely, whether viewers would understand the T-shirt's particularized message that the gifted students were protesting the T-shirt election. *See Community for Creative Non-Violence,* 468 U.S. at 296. Plaintiffs have set forth evidence that the gifted students circulated a petition about the "gifties" T-shirt, although Plaintiffs never explain what the petition actually said or provide the Court with a copy of the petition. (*See* Defs.' Stmt., Ex. Z, R. Darugar Dep., at 67.) In any event, Plaintiffs also point to evidence that because the Gifted Program Coordinator interviewed two regular students

about the T-shirts, other students were aware of the gifted students' claim that the election had been unfair.  (Pls.' Stmt. Add'l Facts ¶ 9.)  Finally, Plaintiffs contend that because Defendants confined the gifted students to their home room whenever anyone in the class wore the T-shirts, other students knew of the gifted students' protest.  (*Id.* ¶¶ 11, 12.)

Again, viewing the evidence and all reasonable inferences in a light most favorable to Plaintiffs, as the Court is required to do at this procedural posture, they have established that there is a genuine issue of material fact whether the other students understood the particularized message about the T-shirt election.

### C.     Basic Educational Mission

Although there is a genuine issue of material fact as to whether the wearing of the T-shirts to school expressed a particularized message understood by its viewers, the Court must also determine whether the gifted students' speech was inconsistent with Beaubien School's basic educational mission.  *See Kuhlmeier,* 484 U.S. at 266 (citing *Fraser,* 478 U.S. at 685). Specifically, students "cannot be punished merely for expressing their personal views on the school premises ... unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'"  *Kuhlmeier,* 484 U.S at 266 (quoting *Tinker,* 393 U.S. at 509).

Evidence in the record suggests that tensions existed between the gifted and regular students and that some incidents had occurred between gifted and regular students.  (Defs.' Stmt. ¶ 93;  Pls.' Stmt. Add'l Facts ¶ 14.)  Also, there were some safety concerns involved.  (*Id.*) There is also evidence that the design on the T-shirt may have insulted students with physical deformities.  (Pls.' Stmt. Add'l Facts ¶ 5.)  Furthermore, some of the regular students were upset

that the T-shirt controversy might disrupt their eighth grade yearbook, their class trip to Springfield, and graduation.  (R. 167-1, Pls.' Appendix, Ex. D, Crisis Team Report, at 1.)  Based on this evidence, there is a genuine issue of material fact whether the producing and wearing of the T-shirts to school substantially interfered with the school's work or impinged upon the rights of other students.

## II.      Qualified Immunity

Nevertheless, the individual Defendants assert that the doctrine of qualified immunity protects them from this lawsuit.  In general, qualified immunity shields government officials performing discretionary functions from civil litigation.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  The goal of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."  *Id.*  Denying summary judgment any time a material issue of fact exists as to the underlying constitutional claim undermines the goal of qualified immunity.  *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  Accordingly, "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  *Id.* at 200.

Under the doctrine of qualified immunity, "[i]f the law did not put the [public official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Id*. at 202. When determining whether qualified immunity shields a public official from a Section 1983 action, the Court undertakes a two-part inquiry.  *Jones v. Wilhelm,* 425 F.3d 455, 460 (7th Cir. 2005).  The Court's first inquiry is whether the facts,

viewed in the light most favorable to Plaintiffs, show that the individual Defendants violated a constitutional right. *Id.* (citing *Saucier,* 533 U.S. at 201). If the facts comprise a constitutional violation, the Court must determine whether the constitutional right was clearly established at the time of Defendants' conduct. *Wernsing v. Thompson,* 423 F.3d 732, 742 (7th Cir. 2005) (citing *Saucier*, 533 U.S. at 201).

Assuming *arguendo* that Plaintiffs have established that Defendants violated their First Amendment right to free speech because a genuine issue of material facts exists as to that question, the Court turns to the second qualified immunity prong because failure to establish either prong is dispositive. *See Jones v. Wilhelm,* 425 F.3d at 460. Under the second inquiry, Plaintiffs bear the burden of establishing that their First Amendment rights were "clearly established." *Wernsing*, 423 F.3d at 742. To do so, Plaintiffs "must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right." *Id.*

Plaintiffs heavily rely on *Tinker* to demonstrate the second qualified immunity prong. In *Tinker*, two high school students and one junior high student wore black armbands to school "to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and by their example, to influence others to adopt them." *Id.* at 514. The school administration subsequently prohibited the armbands and suspended the students in violation of a school policy after which the students brought a First Amendment action in federal court. *Id.* at 504-05. Because the students' conduct was not disruptive, more specifically, because there was nothing in the record that established that the wearing of the armbands "would substantially interfere with the work of the school or impinge upon the rights of other students" the Supreme

Court concluded that the school could not prohibit the students from wearing the armbands. *Id.* at 509, 514.

Although Plaintiffs contend the facts in *Tinker* are sufficiently similar to the case at hand, Plaintiffs' reliance on *Tinker* as clearly established law is not dispositive of the Court's inquiry because the Supreme Court has modified the *Tinker* holding. *See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). The Seventh Circuit has articulated that since the *Tinker* decision, "the Supreme Court has cast some doubt on the extent to which students retain free speech rights in the school setting." *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 736 (7th Cir. 1994). Another Seventh Circuit panel recognized that "Supreme Court decisions since *Tinker* indicate that the teaching of civility and the inculcation of traditional moral, social, and political norms may override student expression, or at least that it is permissible for a school board to so order its educational priorities." *See Muller v. Jefferson Lighthouse Sch.,* 98 F.3d 1530, 1539 (7th Cir. 1996). Because the Supreme Court has modified the *Tinker* holding, *Tinker* alone is not dispositive of the Court's "clearly established" inquiry as Plaintiffs suggest.

Thus, the Court must determine whether the alleged misconduct constituted an obvious violation of a constitutional right. *See Jones v. Wilhelm,* 425 F.3d at 460. The Court's "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *See Saucier,* 533 U.S. at 202 (inquiry "undertaken in light of the specific context of the case, not as a broad general proposition"); *see also Hosty v. Carter,* 412 F.3d 731, 738 (7th

Cir. 2005) (en banc).  In other words, the Court looks to whether a reasonable public official in the individual Defendants' positions would have understood that his or her actions were unlawful in the factual situation at hand.  *See Anderson v. Creighton,* 483 U.S. 635, 640-41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (law at time of conduct must have been "clear in relation to the specific facts confronting the public official when he acted"); *see also Wernsing*, 423 F.3d 742 ("contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").  Although this is an objective test, subjective factors are not ignored, such as the information Defendants possessed at the time they prohibited the alternative T-shirt.  *See Hammond v. Kunard,* 148 F.3d 692, 696-97 (7th Cir. 1998) (citing *Anderson v. Creighton,* 483 U.S. at 641).

Here, there is evidence in the record that there were tensions between the regular students and the gifted students and that Defendants had safety concerns as a result of these tensions. (*See* Defs.' Stmt. ¶ 114, Ex B., Rosales Dep. at 46.)  To remedy the situation, Kotis and Rosales attempted to address the T-shirt controversy by meeting with the gifted students and their parents, suggesting that the students talk to the Local School Board, giving the students options of when and how they could wear the T-shirts, and consulting a Crisis Intervention Team. (Defs.' Stmt. ¶¶ 70, 125, 127.)  Although Principal Kotis prohibited the wearing of the T-shirt and restricted the gifted students to their home room if the students wore the T-shirt to school, once the Crisis Intervention Team concluded there were no safety concerns, Principal Kotis allowed the students to wear the T-shirts again.  (R. 167-1, Pls.' Appendix, Ex. D, Crisis Team Report, at 1; Defs.' Stmt. ¶ 133.)

Under these circumstances, the contours of the gifted students' First Amendment rights

18

would not be sufficiently clear to a reasonable official that what he or she was doing violated those rights, especially because Defendants' restrictions concerning the T-shirts took place in the nonpublic setting of a school. *See Muller,* 98 F.3d at 1537 ("Speech in nonpublic forums is subject to significantly greater regulation than speech in traditional public forums"). Moreover, case law regarding student speech under the First Amendment is nuanced, and thus the law is not as clear cut as Plaintiffs argue. As the Seventh Circuit recognized "[m]any aspects of the law with respect to students' speech, not only the role of age, are difficult to understand and apply." *See Hosty*, 412 F.3d at 739. The *Hosty* Court further reasoned that "public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved." *Id.*

These "constitutional uncertainties" in student speech are illustrated by Plaintiffs' confusion over the concept of imprimatur. In *Kuhlmeier,* the Supreme Court held that if parents, students, and members of the public reasonably ***perceive*** a student's expressive conduct to bear the imprimatur of the school, the school could censor the student's conduct as long as the school's actions were reasonably related to legitimate pedagogical concerns. *See Kuhlmeier,* 484 U.S. at 271-73. Plaintiffs argue that *Kuhlmeier* is not controlling because the school did not sponsor the "gifties" T-shirt. The relevant inquiry, however, is whether the public, parents, and other students would perceive that the T-shirt reflected the school's imprimatur, that is, that it appeared that the school approved the T-shirt design. Here, it is undisputed that the design of the "gifties" T-shirt included the words "Beaubien Class of 2003" and "Beaubien Bulldog," and thus the public, students, and parents might reasonably perceive that the "gifties" T-shirt was actually approved by the Beaubien administration. Consequently, the Beaubien administration was entitled to exercise greater control over this particular type of student speech. *See id.* at 271.

Accordingly, under the legal uncertainties concerning First Amendment rights to free speech in the school setting, the school administration's prohibition of the gifted students' T-shirt was not an obvious violation of the students' First Amendment rights. *See Jones v. Wilhelm,* 425 F.3d at 460. In sum, a reasonable official in the individual Defendants' position could not have known ***definitively*** whether the prohibition of the T-shirts violated the gifted students' First Amendment rights. *See Wernsing*, 423 F.3d at 750. As such, Plaintiffs have not met their burden in establishing that their constitutional rights under the particular circumstances of this case were "clearly established" at the time of the alleged constitutional violation. *See Anderson v. Creighton,* 483 U.S. at 640-41. Thus, the doctrine of qualified immunity shields Kotis, Clancy, Rosales, and Laughlin from Plaintiffs' First Amendment claims. The Court's conclusion is further supported by the decision in *Wood v. Strickland,* 420 U.S. 308, 319-20, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), in which the Supreme Court articulated that:

> Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties.... Denying any measure of immunity in these circumstances would contribute not to principled and fearless decision-making but to intimidation. The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students.

*Id*. at 319-20 (internal citation and quotation omitted). The Court thus dismisses Plaintiffs' claims against Kotis, Clancy, Rosales, and Laughlin[4] in their individual capacities.

---

[4] For an individual to be liable under Section 1983, she must have caused or participated in the alleged constitutional violation. *Pepper v. Village of Oak Park,* 430 F.3d 805, 810 (7th Cir. 2005). Thus, Plaintiffs must establish that the individual Defendants "acquiesced in some

### III. Monell Claim

Plaintiffs' First Amendment claim against Kotis, Rosales, Laughlin, and Clancy in their official capacities is a claim against the Board of Education as a local governmental unit. *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985) (citing *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 690, n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In other words, official capacity suits brought against individuals are "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. at 165 (citation omitted). Because Plaintiffs' claims against the individual Defendants in their official capacities are claims against the Board and thus duplicative, the Court dismisses the individual Defendants in their official capacities from this lawsuit.

To state a constitutional claim against the Board, Plaintiffs must establish that an official custom or policy caused a deprivation of their First Amendment right to free speech. *See Monell,* 436 U.S. at 690-91; *Sornberger v. City of Knoxville, Illinois,* 434 F.3d at 1006, 1029 (7th Cir. 2006) (under Section 1983 government agency cannot be liable on theory of respondeat superior). To demonstrate that an official custom or policy caused the alleged violation of their First Amendment rights, Plaintiffs must establish one of the following scenarios: (1) the Board has an express policy that, when enforced, causes a constitutional deprivation; (2) the Board has a widespread practice that, although not authorized by written law or express policy, is so

---

demonstrable way in the alleged constitutional violation." *Palmer v. Marion Count.,* 327 F.3d 588, 594 (7th Cir. 2003); *see also Hosty v. Carter,* 412 F.3d 731, 731 (7th Cir. 2005) (en banc) (Section 1983 does not create vicarious liability). The record does not support the proposition that Defendant Laughlin caused or participated in the prohibition of the "gifties" T-shirt. Thus, the Court also dismisses Laughlin on the ground that she was not personally involved in the alleged deprivation of Plaintiffs' First Amendment rights.

permanent and well-settled that it constitutes custom or usage within the force of law; or (3) a person with final policymaking authority caused the constitutional injury. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

### A.    Final Policymaking Authority

Plaintiffs argue that Principal Kotis was an individual with final policymaking authority in the area of school conduct and discipline, and therefore the Board is liable for Kotis' conduct under the third *Monell* scenario.  Under Section 1983, an individual's status as a final policymaker is a question of state or local law.  *Killinger v. Johnson,* 389 F.3d 765, 771 (7th Cir. 2004); *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).  To identify public officials with final policymaking authority, the Court reviews state and local law, as well as custom or usage having the force of law.  *Killinger,* 389 F.3d at 772 (citation and quotations omitted).

Plaintiffs specifically contend that Principal Kotis is an individual with final "decision making" authority in the area of school conduct and discipline based on UDC Rule 2-5.  (R. 165-1, Pls.' Mem. In Opp. to Board's M. Summ. J., at 4.).  Plaintiffs, however, confuse "decision maker" with "final policymaker."  Not every decision a public official makes involves policymaking as required under the *Monell* framework.  *See Pembaur,* 475 U.S. at 482.  "The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  *Id.*  Instead, the public officer "must be responsible for establishing final government policy respecting such activity before the municipality can be held liable."  *Id.* at 482-83.

Pursuant to the Board of Education Rules:

> Principals of schools are the responsible administrative heads of their respective schools and are charged with the organization, supervision, administration, and discipline thereof. They shall establish and enforce such regulations, not contrary to the Rules of the Board of Education, the Uniform Discipline Code, or the regulations of the General Superintendent of Schools, as in their judgment may be necessary for the successful conduct of their schools.

(Defs.'s Stmt. ¶ 9, Ex. E, Bd. of Educ. Rules, Section 6-12.) From the unequivocal language of Section 6-12 of the Board's Rules, principals in the Chicago Public Schools have the discretionary authority to make decisions contingent upon the Board Rules, the UDC, and the regulations of the General Superintendent of Schools. The Board's Rules, however, do not confer the authority for principals to make city-wide policy decisions. *See Killinger,* 389 F.3d at 771 ("mere authority to implement pre-existing rules is not the authority to set policy"). That authority is left to the School Board. *See* 105 ILCS 5/10-20.5; *see also Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84,* 133 F.3d 1054, 1059- 60 (7th Cir. 1998) (Board of Education has authority to manage schools and adopt rules and regulations needed for that purpose); *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.,* 118 Ill.2d 389, 404, 113 Ill.Dec. 915, 515 N.E.2d 1222 (1987) (same). Consequently, Principals Kotis is not a "final policymaker" as Plaintiffs claim.

Nonetheless, Plaintiffs contend that because UDC Rule 2-5 is unconstitutionally overbroad it provides the basis for Principal Kotis' policymaking authority. Specifically, Plaintiffs argue that the disciplinary rule is "effectively and actually a delegation by the Board of Education of unconstitutional power and authority to any and all Chicago Public School principals and administrators." (R. 165-1, Pls.' Mem. In Opposition to Board's M. Summ. J., at

4.)[5]  In general, a plaintiff may challenge rules, regulations, or laws as facially unconstitutional under two theories – the overbreadth doctrine and the void for vagueness doctrine.  *See Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir. 2001).  "The overbreadth doctrine allows a plaintiff to ask that a law be struck down based not on how it affects the plaintiff but on how it might be applied to third parties not before the court." *Anderson v. Milwaukee County*, 433 F.3d 975, 979 (7th Cir. 2006); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression").  "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society – to prevent the statute from chilling the First Amendment rights of other parties not before the court."  *Secretary of State of Maryland. v. Munson,* 467 U.S. 947, 958, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984).  Because of the overbreadth doctrine's far-reaching effects, courts must apply it "with hesitation" and "only as a last resort."  *Los Angeles Police Dep't v. United Reporting Publ'g Corp.,* 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) (citation omitted).

Under the Uniform Discipline Code, there are six groups of misconduct, including:  (1) misconduct that includes inappropriate student behaviors, such as running in the hall; (2)

---

[5]  Plaintiffs also argue that the disciplinary and dress codes constituted an unconstitutional prior restraint of the students' free speech.  Not only is Plaintiffs' argument cursory and undeveloped, Plaintiffs' contention that Defendants' conduct constituted viewpoint discrimination is simply not supported by the record.  *See Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 813, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (prior restraints in nonpublic forums permissible when reasonable and viewpoint neutral); *Anderson v. Milwaukee County*, 433 F.3d 975, 979 (7th Cir. 2006) (same); *see, e.g., Muller v. Jefferson Lighthouse Sch.,* 98 F.3d 1530, 1550 (7th Cir. 1996).

misconduct that disrupts the orderly educational process in school, including leaving the school without permission; (3) conduct that seriously disrupts the educational process, such as gambling; (4) conduct that includes assault, extortion, vandalism, and other offenses; (5) conduct such as burglary and gang activity; and (6) conduct such as arson, murder, and kidnaping. (Defs.' Stmt. ¶ 11, Ex. F, Uniform Discipline Code at 19-25)  At issue is Group 2 misconduct, namely, conduct that disrupts the school's educational process.  Under Group 2, the disciplinary code lists ten behaviors that constitute such disruptive conduct, including defying the authority of school personnel and failing to abide by school rules and regulations.  (*Id*.; Pls.' Stmt. Add'l Facts ¶ 37.)  Here, the gifted students failed to abide by the Beaubien School Dress Code No.2, which states in relevant part:  "Clothing with inappropriate words or slogans is not permitted." (Pls.' Stmt. ¶ 9.)

Plaintiffs argue that UDC Rule 2-5 is overbroad because it is a rule which states that students cannot violate a rule and is therefore redundant.  The Court disagrees.  As the Seventh Circuit recently instructed "[c]ommon sense must not be and should not be suspended when judging the constitutionality of a rule or statute."  *See Anderson v. Milwaukee County*, 433 F.3d at 978.  Under the common sense interpretation of the disciplinary code, it is evident that Section 2-5 is specifically directed at student conduct that disrupts the school's educational process. "Failing to abide by school rules and regulations" means that if you fail to follow the school rules, such as the school dress code, your conduct is considered disruptive.  There is nothing redundant about the code and its directive is sufficiently narrow and reasonable because it applies to the school rules and regulations and is limited by reference to those rules.  *See id.* at 979.  The *Tinker* decision and its progeny further support this conclusion because speech in

nonpublic forums, such elementary schools, is subject to significantly greater regulation than speech in traditional public forums. *See Muller,* 98 F.3d at 1537. Thus, restrictions of speech in nonpublic forums need only be reasonable. *Anderson v. Milwaukee County,* 433 F.3d at 980.

Next, Plaintiffs contend that UDC Rule 2-5 and the dress code are void for vagueness. Specifically, Plaintiffs argue that "[w]ith no way of identifying the source of content of the underlying rules, a student might not even know about the rules until they were violated. A rule must provide at least minimal notice so that a student may conform his or her actions to the rule." (R. 133-1, Mem. In Support of M. Part. Summ. J., at 11.) Plaintiffs also argue that the rule is circuitous and confusing.

"A law is void for vagueness if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior." *Anderson v. Milwaukee County,* 433 F.3d at 978 (citing *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). For a plaintiff to succeed on a vagueness claim, she must demonstrate that the rule is impermissibly vague in all of its applications. *Fuller,* 251 F.3d at 667 (citation and quotation omitted). In the context of school disciplinary codes, the Supreme Court gives the following guidance: "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser,* 478 U.S. at 686.

Although Plaintiffs unequivocally argue that they are facially attacking the disciplinary rule and dress code, they do not attempt to show that the that the rules are unconstitutional in all

of their applications as opposed to "as applied" to the students themselves. *See Fuller,* 251 F.3d at 667-68; *see also United States v. Rodgers,* 755 F.2d 533, 544 (7th Cir. 1985) ("party seeking to overturn a statute for vagueness on its face must in essence establish that it is unconstitutionally vague in at least a substantial number of the cases to which it could apply"). Consequently, Plaintiffs' attempt to facially attack the disciplinary rule and dress code as unconstitutionally vague simply fails because they do not address the code's overall applications. *See Fuller,* 251 F.3d at 667-68.

In short, UDC Rule 2-5 in conjunction with the dress code is not overbroad or vague and does not confer any policy making authority to Principal Kotis as Plaintiffs contend. Thus, Plaintiffs' argument based on the third *Monell* scenario fails because Principal Kotis did not have final policymaking authority under the circumstances.[6]

**B.      Express Policy**

Plaintiffs also argue that UDC Rule 2-5 and the school dress code embody an express policy that caused and directly contributed to the students alleged constitutional deprivation. This argument relies on the first *Monell* scenario, namely, that the Board has an express policy, that when enforced, deprived the gifted students of their First Amendment right to free speech.

"The express policy theory applies, as the name suggests, where a policy explicitly

---

[6] Plaintiffs' arguments that the Board's delegation of authority to the Department of Law and that certain Board members' inaction establishes municipal liability are not only undeveloped, but Plaintiffs fail to cite any legal authority to support these claims. Thus, Plaintiffs have waived these arguments. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"). In fact, these claims do not fall under the *Monell* rubric, but instead appear to be loosely based on the doctrine of respondeat superior which cannot apply to governmental units such as the Board of Education. *See Sornberger v. City of Knoxville, Illinois,* 434 F.3d at 1006, 1029 (7th Cir. 2006).

violates a constitutional right when enforced." *Calhoun,* 408 F.3d at 379 (policy must violate

constitutional right "on its face").  Because the Plaintiffs' claim partially rests on the Beaubien

School dress code, Plaintiffs have not established that there is a Board of Education policy at

issue.  *See id.* at 380.  In other words, the Beaubien School dress code cannot form the basis of

liability under *Monell* because it is not a Board policy or custom in the first instance.  *See*

*Chortek v. City of Milwaukee,* 356 F.3d 740, 748-49 (7th Cir. 2004) ("Only those individuals with

the requisite policymaking authority are capable of establishing 'official policy' as required by

*Monell*").  As discussed, because Principal Kotis does not have the requisite policy making

authority under the circumstances, Plaintiffs' claim based on the disciplinary code in conjunction

with the school dress code must fail.  *See id.* at 749.  The Court thereby dismisses Plaintiffs'

claims against the Board.

## CONCLUSION

For these reasons, the Court denies Plaintiffs' Partial Motion for Summary Judgment.

The Court grants Defendant School Board's Motion for Summary Judgment, Defendants

Laughlin's and Clancy's Motion for Summary Judgment, Defendant Kotis' Motion for Summary

Judgment, and Defendant Rosales' Motion for Summary Judgment.  Finally, the Court denies

Defendants' Motion to Strike as moot.

Dated:  March 13, 2006

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**